MARIO AND IRENE MOSTEIRIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mosteirin v. Commissioner
Docket No. 3996-94
United States Tax Court
T.C. Memo 1995-367; 1995 Tax Ct. Memo LEXIS 370; 70 T.C.M. (CCH) 305; August 7, 1995, Filed *370 Decision will be entered under Rule 155. For petitioners: James O. Druker. For respondent: Peggy Gartenbaum and Jody Tancer. BEGHE
BEGHE
MEMORANDUM FINDINGS OF FACT AND OPINION BEGHE, Judge: Respondent determined a deficiency of $ 8,464 in petitioners' Federal income tax for the taxable year 1991 and an addition of $ 1,693 under section 6662(a). [1]
The sole issue for decision is whether petitioner Mario Mosteirin (petitioner) performed services as an employee or as an independent contractor during the year in issue, which in turn determines whether petitioner's business expenses are subject to the 2 percent of adjusted gross income floor of section 67. Respondent does not contest petitioners' claimed business expense deductions, but argues that all such expenses are deductible as Schedule A unreimbursed employee business expenses subject to the 2 percent of adjusted gross income floor and the alternative minimum tax, and *371 not as an independent contractor's Schedule C business expenses, which are fully deductible and are not subject to the alternative minimum tax. The parties have agreed that if the Court determines petitioner had an independent contractor relationship with Allstate during 1991, then the cost of benefits paid by Allstate for petitioner, consisting of medical, dental, long-term disability, basic life and accidental death coverage, and the increase in the value of his retirement benefits under the Allstate pension plan, would be taxable to petitioner, that the amount paid by Allstate in respect of petitioners' Social Security would not be taxable to petitioners, that petitioner would be liable for self-employment tax, and that petitioners would not be liable for the accuracy-related penalty under section 6662(a). We hold that petitioner performed services for Allstate as an independent contractor. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. Petitioners resided in Greenlawn, New York, at the time their petition was filed. In August 1985, petitioner executed an Allstate Agent Employment Agreement. That agreement governed petitioner's *372 relationship with Allstate until October 1988 when petitioner signed an amendment to the agreement and assumed a newly created insurance sales agent position known as a Neighborhood Office Agent (NOA). Under the amended agreement, petitioner agreed to devote all his business time to selling Allstate insurance products. Petitioner agreed not to represent or solicit insurance for any other company without Allstate's prior written consent. As a limited exception to this general rule, the amended agreement permitted petitioner to write insurance applications under assigned risk plans (so long as Allstate participated in any such plan) and to represent any affiliate specified by Allstate. As an NOA, petitioner assumed primary financial responsibility for the success of his career. Petitioner earned all his income through commissions on new business and renewals. Petitioner personally bore the obligation to pay for most of his business expenses. Petitioner selected his office location, subject to Allstate's approval. He negotiated his leases and paid for improvements to the leased properties. Allstate required that the lease agreement expressly provide that Allstate was not a party to *373 the lease and had no responsibility with respect to the lease. Petitioner was responsible for selecting and paying all personnel working in his office. The decision to retain personnel was an exercise of petitioner's professional judgment made in connection with his responsibility to operate his own office. Petitioner interviewed potential employees, fixed the terms and conditions of their employment, maintained day-to-day authority over them, and established and paid their compensation. Under the amended agreement, Allstate played only a limited role in determining whether petitioner could or should hire personnel. Allstate reserved the rights to approve personnel hired by petitioner (Allstate generally obtained background checks which were paid for by petitioner) and to limit the number of agents who might occupy one office. In addition, Allstate provided an administrative requirement that personnel retained by petitioner be routed through an employee leasing service approved by Allstate. The leasing service paid such personnel and was in turn reimbursed by petitioner. During 1991, Eric Stearns worked at petitioner's office as a sales producer; he was an employee of Alcott Staff *374 Leasing, Inc., an approved employee leasing service. However, David Ouziel and Kevin Mack, who were also sales producers in petitioner's office, and Delores Stefanelli, petitioner's secretary, were direct employees of petitioner and were not employed by Alcott Staff Leasing, Inc., or any other approved employee leasing service. As part of the NOA agreement, petitioner received an Office Expense Allowance (OEA) from Allstate. The OEA was not based on actual amounts expended, but on a percentage of petitioner's gross sales of Allstate insurance products for immediately preceding periods. Specifically, the dollar amount reimbursed to petitioner under the OEA arrangement was based on a quarterly calculation using the 12 prior months' new and renewal premiums. OEA expenses were reimbursed to petitioner on a monthly basis upon his presentation of substantiation in the form of receipts for expenses in approved categories, including office rent, clerical and producers' salaries, telephone, postage, yellow page display ads under a cooperative advertising program for NOA's, office repair and maintenance, etc. The amounts of petitioner's OEA reimbursements for 1991 totaled $ 28,714.23, which *375 petitioner reported as part of gross receipts on Schedule C to his 1991 return. During the year in issue, the OEA was insufficient to reimburse petitioner completely for business expenses he incurred, which were more than twice his OEA. Allstate had no responsibility to reimburse petitioner for business expenses exceeding his OEA. In addition to the OEA, Allstate was obligated under the amended agreement to provide petitioner with a start-up office furniture package (e.g., desks, chairs, and a filing cabinet), which remained Allstate property. Petitioner was responsible for purchasing or leasing other operating equipment, such as a copier, computer, fax machine, and telephone system. Allstate also advanced petitioner $ 3,650 as a working fund to help meet start-up expenses; petitioner was obligated to repay this advance to Allstate upon demand, without interest. The amended agreement required petitioner to maintain regular business hours and to attend occasional training and development programs to learn about changes in the insurance industry and features of new insurance products. At all times, however, petitioner used his own styles and methods to sell insurance. As part of *376 his relationship with Allstate, petitioner received certain fringe benefits. Those benefits included compensated vacation days, participation in an Allstate funded pension plan, participation in an Allstate 401(k) plan, partial funding of petitioner's health insurance, and contribution to petitioner's dental and life insurance plans. Many of these fringe benefits began before petitioner became an NOA and remained in effect after he signed the amended agreement. Petitioner had neither exclusive territorial rights nor any vested interest in any business produced under the terms of the amended agreement. Under the amended agreement, all records petitioner maintained pertaining to Allstate policy holders were Allstate property and were required to be surrendered upon demand. Further, all premium payments collected by petitioner were required to be treated as trust funds and promptly transmitted from petitioner to Allstate without deduction of amounts due from Allstate to petitioner and without petitioner making any other deductions for any purpose. Also, Allstate reserved the right to reject any insurance application or terminate or refuse to renew any policy. As an NOA, petitioner generally *377 had an annual meeting with an Allstate market sales manager (an individual employed by Allstate to monitor the operations of NOA's). The individual having this responsibility with respect to petitioner during 1991 was Ms. Carrie Cotter. Each of their meetings resulted in the preparation by Ms. Cotter of a Business Analysis Review that assessed petitioner's performance in seven categories: productivity, quality, retention, program support, customer service, administration and overall role from the standpoint of whether that performance exceeded or met the performance of his peers or needed improvement or immediate improvement. During the two reviews that covered the 2-year period August 1990 through July 1992, petitioner rated near or at the top of his class in terms of productivity. In the other categories, petitioner either met requirements or needed improvement, in some combination, but both reviews were generally favorable. During 1991, there were some specific incidents that resulted in petitioner's position with Allstate being placed in a "job-in-jeopardy" status early in 1992. Petitioner was required to terminate Mr. Stearns, his producer who was employed by the employee leasing *378 service, because of a falsified application for flood insurance prepared by Mr. Stearns. In addition, petitioner had also rewritten a cancelled business insurance policy without authorization, and there had been two or three incidents in which applications and customers' deposits were not promptly sent to Allstate, in accordance with the terms of the amended agreement. All these incidents were referred to in a February 18, 1992, report, signed by petitioner and Ms. Cotter and three other Allstate officials, which set forth standards to be met and an action plan, and which concluded with petitioner's acknowledgement that if he failed to make a reasonable effort toward accomplishing the previously stated goals, his position with Allstate would be terminated. [2]
*379 During the year in issue, which was prior to the job-in-jeopardy report, either petitioner or Allstate could terminate the agreement by mailing written notice of termination. Allstate could not terminate its relationship with petitioner because of unsatisfactory work unless petitioner had received prior notice that his work was unsatisfactory and had been given a reasonable opportunity to bring his performance up to satisfactory standards. From the amended agreement it is apparent that Allstate considered petitioner to be its employee. For the year in issue, Allstate sent petitioner Form W-2 reflecting total wages paid of $ 142,503. Petitioner reported this amount as wages on his 1991 Federal income tax return. On Schedule C, petitioner claimed a net loss from business of $ 38,657 (the difference between his NOA business expenses in the amount of $ 68,760 and his OEA for 1991 in the amount of $ 28,714, plus $ 1,389 paid by other insurance companies under the New York assigned risk plan, a total of $ 30,103). Petitioners' 1991 income tax return also included a Form 2106 (Employee Business Expenses) showing vehicle expenses, meals and entertainment expenses (reduced by 20 percent), *380 and other business expenses, totaling $ 10,375. This amount was included on Schedule A of the return as Job Expenses that were subject to the 2 percent of adjusted gross income floor (adjusted gross income shown as $ 108,643), resulting in a reduction of these expenses, plus $ 190 paid for tax return preparation, by $ 2,173 to $ 8,392. OPINION As a preliminary matter, we will make some observations regarding the driving force underlying the controversy in the case at hand and the other decided cases discussed below. One of the principal purposes for enactment of the 2-percent floor by the 1986 Tax Reform Act was to simplify record keeping and substantiation requirements for employees, most of whom have few incidental expenses in connection with their employment. H. Rept. 99-426 (1985), 1986-3 C.B. (Vol. 2) 1, 109-110; S. Rept. 99-313 (1986), 1986-3 C.B. (Vol. 3) 1, 78-79. NOA's, however, who have what respondent acknowledges are substantial business expenses greatly exceeding the 2-percent floor, are required to keep records and substantiate their business expenses in any event. To apply the 2-percent floor to NOA's would merely *381 amount to an arbitrary reduction in the allowance of their legitimate business expenses, without any offsetting benefit of avoiding the complexity of being required to observe the record keeping and substantiation requirements for business expenses. We recently examined whether insurance salespeople working under NOA agreements are independent contractors or employees, on facts essentially indistinguishable from this case. Butts v. Commissioner, T.C. Memo. 1993-478, affd. per curiam 49 F.3d 713 (11th Cir. 1995); Smithwick v. Commissioner, T.C. Memo. 1993-582, affd. per curiam sub nom. Butts v. Commissioner, 49 F.3d 713 (11th Cir. 1995); see also Feivor v. Commissioner, T.C. Memo. 1995-107; Dunn v. Commissioner, T.C. Memo. 1994-414; Ware v. United States, 850 F. Supp. 602 (W.D. Mich. 1994). In Butts and Smithwick the taxpayers also worked as NOA's for Allstate and deducted their unreimbursed business expenses from gross income, as would an independent contractor, *382 rather than as miscellaneous itemized business deductions, as would an employee deducting unreimbursed employee business expenses. In Butts and Smithwick, we concluded that the taxpayers were professionals associated with Allstate as independent contractors who were thereby permitted to report their income and expenses on Schedule C. In Butts we made detailed findings of fact and addressed the legal arguments at some length. We found: (1) The taxpayer exercised a high degree of control over the manner in which he operated his business; (2) the taxpayer personally incurred most of his business expenses; and (3) the taxpayer bore the burden of risk of loss from his business. In making these findings, we noted that we were not persuaded by the fact that the agreement between Allstate and the taxpayer referred to the taxpayer as an employee or the fact that the taxpayer reported his Allstate income as wages on his Federal income tax return. Rather, we focused on the actual contractual relationship between the contracting parties. In so doing, we observed that a contract purporting to create an employer/employee relationship does not control where application of the common *383 law factors to the facts and circumstances of a particular case establishes that no such relationship exists. In Smithwick we found that there were no essential facts distinguishable from those presented in Butts, and no legal arguments presented by respondent that were not addressed and rejected in Butts. On the basis of our reasoning in Butts v. Commissioner, supra, we concluded that during the year in issue, the taxpayers in Smithwick were professionally associated with Allstate as independent contractors and were entitled to report their business income and expenses on Schedule C. In the case at hand, respondent has asked us to focus on the annual business analysis reviews conducted by Ms. Cotter and on her testimony about the situations that resulted in petitioner's being put in a job-in-jeopardy status as evidencing that Allstate had and exercised the power to control the manner and means by which petitioner performed as an Allstate NOA. We disagree. In our view, the facts brought out with respect to petitioner's business analysis reviews and job-in-jeopardy status are in the same vein as the hypothetical situation discussed in the Butts case with *384 respect to the testimony of Allstate's sales director (who also testified in this case) concerning the circumstances in which an NOA's productivity may become so significantly below his peer group average as to result in a "severe situation" that may cause Allstate to impose a "work plan" upon the NOA, failure to comply with which can result in termination. The actions taken by Allstate in the case at hand did not amount to the exercise of power by Allstate as to the affirmative manner in which petitioner tried to sell insurance to customers on a day-to-day basis, but were designed to deal prospectively with various quality issues and with specific quality problems after they had arisen. We do not find that the existence of these general quality controls or the fact that, if petitioner had failed to follow the standards and action plan he agreed to, there could have been a termination of his business relationship with Allstate, had the effect of rendering him an Allstate employee. [3]
*385 The fact that all but one of petitioner's subordinates were directly hired by him, despite Allstate's policy that such employees should be hired through separate employee leasing services, also shows the limited extent to which Allstate in fact exercised control over petitioner's day-to-day operations. On the basis of our reasoning in Butts v. Commissioner, supra, as adopted and applied in Smithwick v. Commissioner, supra, we conclude that during the year in issue petitioner was professionally associated with Allstate as an independent contractor, and is entitled to report his business income and expenses on Schedule C. As a result, in addition to the amounts of petitioners' expenses deducted on Schedule C and treated by the statutory notice as being subject to the 2-percent floor, the $ 10,375 of expenses appearing on Form 2106 and Schedule A of petitioners' 1991 return, are not subject to the 2-percent floor, and should also be treated as properly included on Schedule C. Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the year in issue.↩
2. Although Ms. Cotter characterized the job-in-jeopardy report as "a very serious document", petitioner's job-in-jeopardy status did not prevent him from receiving a favorable Business Analysis review from Ms. Cotter on September 9, 1992, for the 1-year period ending in July 1992.↩
3. We do not regard these elements in the situation as appreciably different in significance from the kinds of efforts at management by objective that large client corporations, such as Allstate, impose on the outside law firms that represent them, or the quality controls that law firms have in place with respect to their partners.↩